IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

```
-------------------------------------------------x
GAMES WORKSHOP LTD.,             :
                                 :
              Plaintiff,         :
                                 :
        v.                       :        Civil Action No:  04-0013-CV-W-FJG
                                 :
BRIAN BEAL,                      :
                                 :
             Defendant.          :
-------------------------------------------------x
```

**GAMES WORKSHOPS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON ITS COUNTERFEITING, TRADEMARK INFRINGEMENT, UNFAIR COMPETITION, AND COPYRIGHT CLAIMS, AND ON ITS REQUEST FOR ATTORNEYS' FEES**

Michael Elbein (MBE 27708)
Jason E. Gorden (MBE 53592)
HOVEY WILLIAMS LLP
2405 Grand Blvd., Suite 400
Kansas City Missouri 64108-2519
Telephone:  (816) 474-9050
Facsimile:  (816) 474-9057


Mark Sommers
Douglas A. Rettew
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, L.L.P.
1300 I Street, N.W.
Washington, DC  20005-3315
Telephone:  (202) 408-4000
Facsimile:  (202) 408-4400

# TABLE OF CONTENTS

I.      INTRODUCTION ......................................................................................... vi

II.     STATEMENT OF UNCONTROVERTED FACTS ........................................ vi

      A.      Games Workshop and its Products ...................................................... vi

      B.      GW's Trademark Rights in the GW Miniatures ................................... ix

      C.      GW's Copyrights in the GW Miniatures ...............................................x

      D.      Defendant's Wrongful Acts ...................................................................x

      E.      The Court's TRO and Preliminary Injunction Orders ......................... xiv

      F.      Beal's False Compliance Report and Contempt of this Court's Orders ...............xv

III.    ARGUMENT ................................................................................................. 1

      A.      Summary Judgment is Favored Where, as Here, the Material Facts are Undisputed ...................................................................................1

      B.      GW is Entitled to Judgment as a Matter of Law on its Trademark Counterfeiting Claim ...........................................................................2

      C.      GW is Entitled to Judgment as a Matter of Law on its Trademark Infringement and Unfair Competition Claims ........................................3

            1.      The Test for Infringement and Unfair Competition................................... 3

            2.      The Relevant Factors Establish a  Likelihood of Confusion as a Matter of Law ........................................................................... 4

                  a.      GW's Trademarks and Miniature Designs are Strong Marks Entitled to a Brand Scope of Protection............................................4

                  b.      The Parties' Marks are Identical .......................................5

                  c.      The Parties' Products are Competitively Proximate .......................5

                  d.      Beal Intended to Trade Off GW's Goodwill..................................5

                  e.      Actual Confusion Has Arisen ........................................5

                  f.      The Parties' Products are Inexpensive.............................................6

      D.      GW is Entitled to Judgment as a Matter of Law on its Copyright Claims ..............7

            1.      The Standard for Proving Copyright Infringement.................................... 7

2.      GW Owns Copyrights in the GW Miniatures................................................7

3.      Beal Has Infringed GW's Copyrights as a Matter of Law.......................... 8

E.      GW is Entitled to an Award of its Attorneys' Fees as a Matter of Law .................8

IV.      CONCLUSION.............................................................................................................. 10

Case 4:04-cv-00013-FJG    Document 65    Filed 10/15/04    Page 3 of 31

# TABLE OF AUTHORITIES

## FEDERAL CASES

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242 (1986)........................................................................................................1

Anheuser Busch, Inc. v. Balducci Pubs.,
  814 F. Supp. 791, 798 (E.D. Mo. 1993)..........................................................................3

Beer Nuts, Inc. v. Clover Club Foods Co.,
  805 F.2d 920, 928 (10th Cir. 1986) .................................................................................6

Celotex Corp. v. Catrett,
  477 U.S. 317 (1986)........................................................................................................1

Champions Golf Club v. Champions Golf Club,
  78 F.3d 1111, 1117 (6th Cir. 1996) .................................................................................5

Community for Creative Non-Violence v. Reid,
  490 U.S. 730, 737 (1989)................................................................................................7

ConAgra, Inc. v. George A. Hormel & Co.,
  784 F. Supp. 700, 736 (D. Neb. 1992)..........................................................................6, 7

Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.,
  109 F.3d 275, 284 (6th Cir. 1997) ...................................................................................6

Duluth News-Tribune v. Mesabi Publ'g Co.,
  84 F.3d 1093 (8th Cir. 1996) .......................................................................................1, 4

Edmark Indus. v. South Asia Int'l Ltd.,
  89 F. Supp. 2d 840, 844 (E.D. Tex. 2000)......................................................................8

Elvis Presley Enter., Inc. v. Capece,
  141 F.3d 188, 203 (5th Cir. 1988) ...................................................................................5

Hallmark Cards, Inc. v. Hallmark Dodge, Inc.,
  634 F.Supp. 990 (W.D. Mo. 1986) ................................................................................10

Hanover Star Milling Co. v. Metcalf,
  240 U.S. 403 (1916)........................................................................................................3

Hard Rock Café Licensing Corp. v. Concession Servs., Inc.,
  955 F.2d 1143 (7th Cir. 1992) .........................................................................................9

Heidi Ott A.G. v. Target Corp.,
  153 F. Supp. 2d 1055, 1066 (D. Minn. 2001) ...................................................6

Inwood Laboratories, Inc. v. Ives Laboratories Inc.,
  456 U.S. 844 (1982) ...........................................................................................3

Levi Strauss & Co. v. Sunrise International Trading, Inc.,
  51 F.3d 982 (11th Cir. 1995) ............................................................................2

Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,
  799 F.2d 867 (2d Cir. 1986) ...........................................................................2, 6

Louis Vuitton S.A. v. Lee,
  875 F.2d 584 (7th Cir. 1989) .............................................................................9

Matsushita Electric Industrial Co. v. Zenith Radio Corp.,
  475 U.S. 574 (1986) ...........................................................................................1

Metric & Multistandard Components Corp. v. Metric's, Inc.,
  635 F.2d 710, 716 (8th Cir. 1980) ...................................................................10

Microsoft Corp. v. CMOS Techs., Inc.,
  872 F.Supp. 1329 (D.N.J. 1994) ........................................................................2

Microsoft Corp. v. Compusource Distributings, Inc.,
  115 F.Supp.2d 800 (E.D. Mich. 2000) ..............................................................2

Microsoft Corp. v. Computer Service & Repair, Inc.,
  312 F. Supp. 2d 779, 784 (E.D.N.C. 2004) .......................................................8

Mutual of Omaha Insurance Co. v. Novak,
  836 F.2d 397 (8th Cir. 1987) .....................................................................3, 5, 6

S.O.S., Inc. v. Payday, Inc.,
  886 F.2d 1081, 1085 n.3 (9th Cir. 1989) ...........................................................8

Squirtco v. The Seven-Up Co.,
  628 F.2d 1086 (8th Cir. 1980) .......................................................................4, 5

Sturgis Area Chamber of Commerce v. Sturgis Rally & Races, Inc.,
  99 F. Supp. 2d 1090, 1096 (D.S.D. 2000) ......................................................4, 5

Taylor Corp. v. Four Seasons Greetings,
  315 F.3d 1039, 1043 (8th Cir. 2003) .................................................................7

iv

Tri-Star Pictures, Inc. v. Unger,
    14 F. Supp. 2d 339, 364 (S.D.N.Y. 1998)..................................................................10

Walt Disney Co. v. Video 47, Inc.,
    972 F. Supp. 595, 601 (S.D. Fla. 1996) ...................................................................8

WSM, Inc. v. Tennessee Sales Co.,
    709 F.2d 1084 (6th Cir. 1983) ...................................................................................2

Woodsmith Publishing Co. v. Meredith Corp.,
    904 F.2d 1244 (8th Cir. 1990) ...................................................................................2

## FEDERAL STATUTES

15 U.S.C. § 1114............................................................................................................3

15 U.S.C. § 1116(d)(1) ...................................................................................................2

15 U.S.C. § 1117............................................................................................................10

15 U.S.C. § 1125............................................................................................................3

15 U.S.C. § 1127............................................................................................................2

17 U.S.C. § 101..............................................................................................................8

17 U.S.C. § 106..............................................................................................................9

17 U.S.C. § 106(1)..........................................................................................................8

17 U.S.C. § 106(3)..........................................................................................................9

17 U.S.C. § 411..............................................................................................................8

17 U.S.C. § 501..............................................................................................................8

Fed. R.  Civ. P. 56(c) .....................................................................................................1

## MISCELLANEOUS

J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition
    (4th ed. 2001)..............................................................................................5, 6, 9, 10

Senate-House Joint Explanatory Statement on Trademark Counterfeiting Legislation,
130 Cong. Rec. H12076, at 12083 (Oct. 10, 1994) ......................................................9

# I.      INTRODUCTION

This Court has already found twice that Defendant Brian Beal engaged in counterfeiting: first, when it issued a temporary restraining order against Beal; second, when it sanctioned Beal for contempt of the Court's orders.

Having already established that Beal sold counterfeit versions of Games Workshop's gaming miniatures, and in doing so willfully disregarded Games Workshop's rights and this Court's orders, summary judgment is now appropriate on Games Workshop's counterfeiting, trademark infringement, unfair competition, and copyright claims, and on Games Workshop's request for attorneys' fees.

# II.     STATEMENT OF UNCONTROVERTED FACTS

## A.      Glossary

1.      References to Contempt Hearing Transcript are to the Transcript of Motion for Sanctions in this case, dated August 5, 2004, selected pages attached.

2.      References to Smalley Dep. are to the deposition of Patrick Smalley in this case, selected pages attached.

3.      References to Bennett Dep. are to the deposition of Fredrick Bennett in this case, selected pages attached.

4.      References to Compliance Report are to the Compliance Report of Brian Beal of January 16, 2004, attached.

5.      References to Branham Decl. are to the Declaration of Owen Branham, dated December 15, 2003, attached.

6.      References to Bullough Decl. are to the Declaration of Sean Bullough, dated April 1, 2004, attached.

7.    References to Pritchard Decl. are to the Declaration of Hugo Pritchard, dated March 26, 2004, attached.

8.    References to Bennett Decl. are to the Declaration of Frederick Bennett, dated March 4, 2004.

9.    References to Rettew Decl. are to the Declaration of Douglas A. Rettew, dated April 2, 2004.

10.    References to Webb Decl. are to the Declaration of Kari Webb, dated March 31, 2004.

11.    References to Collison Decl. are to the Declaration of Bill Collison, dated March 31, 2004.

12.    References to Martin Decl. are to the Declaration of Kent Martin, dated March 31, 2004.

**B.    Games Workshop and its Products**

1.    Games Workshop Ltd. ("GW") creates, manufactures, and markets table-top war hobby games and related accessories throughout the United States and abroad, and is one of the largest and most successful table-top war games company in the world.  (Verified Complaint, ¶ 6; Transcript of August 5, 2004 Contempt Hearing ("Contempt Hearing Trans.") at 11:6-9.)

2.    GW offers three main games (WARHAMMER, WARHAMMER 40,000, and, by license, THE LORD OF THE RINGS) and a number of specialty games.  Each game has its own elaborate theme and storyline, and is governed by a detailed point structure and lengthy set of rules.  (Verified Complaint, ¶¶ 7-8; Contempt Hearing Trans. at 11:10-12:1; Smalley Dep. at 12:5-14:24; Bennett Dep. at 6:14-11:9.)

3.     For example, WARHAMMER 40,000 is a complex science-fiction war-strategy game set in the forty-first millennium featuring a futuristic war with human and alien warrior combatants in a fictional galaxy.  (Verified Complaint, ¶ 8; Bennett Dep. at 7:3-10.)

4.     GW also offers a vast selection of game-related merchandise, including books, templates, game cards, and a wide range of meticulously designed and crafted miniatures, such as model warriors, weapons, vehicles, and machines ("GW Miniatures").  (Verified Complaint, ¶ 11.)

5.     Each GW Miniature represents a collection of highly detailed characteristics rated according to a point scale.  Point assignments reflect the particular GW Miniature's proficiency at marksmanship, the distance it can move in a turn, the level of complexity of weaponry it can operate, its leadership abilities, and its relative strengths and weaknesses.  Each GW Miniature's individual characteristics determine how effective it will be in the game.  (Verified Complaint, ¶¶ 10-11; Contempt Hearing Trans. at 12:2-12; Bennett Dep. at 7:21-8:11.)

6.     GW promotes and sells its games and their numerous associated GW Miniatures, books, and other items through a wide variety of retail trade channels, including shops, catalogs, mail order, trade shows and conventions, and GW's Internet website.  (Verified Complaint, ¶ 12.)

7.     As a result of the immense popularity of GW's games and products, a secondary marketplace for the GW Miniatures has arisen on eBay's auction website, where players sell new or used miniatures, including models no longer in production.  (Verified Complaint, ¶¶ 13; Contempt Hearing Trans. at 56:2-6.)

8.     As a result of GW's creative efforts, and its careful quality control over the

unique appearance of its GW Miniatures and every aspect of its games, GW's products are the

benchmark of science fiction war games.  (Verified Complaint, ¶ 14.)

**C.     GW's Trademark Rights in the GW Miniatures**

9.     GW has created unique trademarks for its GW Miniatures, which serve as

indicators to consumers that a particular miniature is made and/or authorized by GW for use with

its games.  (Verified Complaint, ¶ 18.)

10.     Among its many other marks, GW has established common-law rights through

use, and owns federal trademark registrations for, the following marks for its products:

| Mark | Registration No. | Registration Date |
|---|---|---|
| GAMES WORKSHOP | 1,739,791 | December 15, 1992 |
| GAMES WORKSHOP (Stylized) | 1,697,771 | June 30, 1992 |
| SPACE MARINE | 1,922,180 | September 26, 1995 |
| ELDAR | 1,944,847 | January 2, 1996 |
| KROOT | 2,777,143 | October 28, 2003 |
| WARHAMMER | 2,718,741 | May 27, 2003 |
| FORGEWORLD | 2,751,558 | August 19, 2003 |
| WARMASTER | 2,394,113 | October 10, 2000 |
| NECRONS | 2,206,015 | November 24, 1998 |
| DARK ANGELS | 1,913,474 | August 22, 1995 |
| CITADEL | 1,921,886 | September 26, 1995 |
| DEATHWING | 1,865,322 | November 29, 1994 |
| EPIC | 1,741,460 | December 22, 1992 |
| TALISMAN | 1,659,016 | October 1, 1991 |
| BLOOD BOWL | 1,654,413 | August 20, 1991 |
| CITADEL & Design | 1,838,767 | June 7, 1994 |

(Verified Complaint, ¶ 19, Ex. F.)

11.     Through use and promotion, GW has also established trademark rights in the

marks GW, 40K, and SQUAT in connection with its gaming products.  (Verified Complaint, ¶

20.)

**D.    GW's Copyrights in the GW Miniatures**

12.    All GW Miniatures are original designs created exclusively by GW, including the following miniatures:  Space Marine Captain, Space Marine With "Flamer" Weapon, Tyco, Elder Warlock With Sword, and Elder Warlock With Spear.  GW created these miniatures outside of the United States in a Berne Convention country and is accordingly the owner of the copyrights to these miniatures.  (Verified Complaint, ¶ 16, Exs. A-E.)

**E.    Defendant's Wrongful Acts**

13.    In early 2003, GW received a consumer complaint that an individual was allegedly selling counterfeit, low quality, GW Miniatures on eBay under the user name "mac-ace."  (Verified Complaint, ¶ 21.)

14.    "mac-ace" is the eBay name used by Defendant Brian Beal.  (Contempt Hearing Trans. at 57:12-16; Verified Complaint, ¶ 22-23, Ex. G.)

15.    Beal is involved in the gaming community and is a member of the board of directors of the gaming organization Heart of America Historical Miniature Gaming Society ("HAHMGS"), and serves as the group's "Convention Director/Editor."  (Verified Complaint, ¶ 24.)

16.    Beal makes money by selling a variety of items on eBay, including miniatures that Beal identifies as genuine GW Miniatures.  (Contempt Hearing Trans. at 56:2-6.)

17.    Beal "specializes" in the sale of miniatures purporting to be from GW's WARHAMMER 40K game.  (Contempt Hearing Trans. at 58:6-11.)

18.    Beal displays an in-depth knowledge of GW's games and miniatures in the textual descriptions of his auctions.  For example, in a recent auction, Beal included the following explanation of his goods:

Includes a Warlock and 4 troupers. The best hand to hand fighters in the game. Armed with pistols, swords, axes and the back mounted automatic grenade lainchers [sic]. From the Rogue Trader era, very OOP.[1] Supposedly coming back in the new codexes.

(Verified Complaint, ¶ 27, Ex. K.)

19.     Beal buys the GW Miniatures he sells on eBay at very low prices. As a general rule of thumb, Beal only buys miniatures that can be resold for twice the price he paid.

(Contempt Hearing Trans. at 58:18-25.)

20.     Over the years, Beal has sold thousands of miniatures on eBay that he identified as genuine GW Miniatures. (Contempt Hearing Trans. at 59:1-3, 59:4-60:14.).

21.     Beal has received multiple consumer complaints for selling low-quality counterfeit GW Miniatures. (Verified Complaint, ¶ 26; Contempt Hearing Trans. at 63:23 - 73:15, Exs. P-23, P-22.)

22.     Numerous consumers have posted complaints about Beal's sale of counterfeits on eBay. (As a self-policing measure, the eBay website allows purchasers to post comments on a particular seller, and permits the seller the opportunity to respond.) Examples of some of these complaints, often dismissed by Beal with pejorative responses, are shown below:

•     ***Complaint:*** Item was fake, play would destroy it, would work for terrain.
      ***Response by mac-ace*** – if you take less than a month and a half to complain I might care. (October 21, 2003)

•     ***Complaint:*** Came EVENTUALLY. These are OBVIOUSLY crappy lead re-casts. i.e. FAKES! (May 22, 2003)

•     ***Complaint:*** Rude and offensive seller. Refused to pay for his probably fake miniatures.
      ***Response by mac-ace*** – I am rude and offensive, to people who bid and then refuse to pay, polock. (March 17, 2003)

•     ***Complaint:*** Buyer sells counterfeit GW OOP products, DO NOT BUY. ILLEGAL

---

[1]  The designation "OOP" is commonly used to describe GW Miniatures that are "out of production." (Verified Complaint, ¶ 27.)

FORGERIES.  (February 25, 2003)

- **_Complaint:_**  Recast GW figure from low quality lead, cheap imitation, poor customer service.
  **_Response by mac-ace_** – And a Merry Xmas to you too!  I notice you kept the figure. (December 27, 2002)

(Verified Complaint, ¶ 26, Ex. J; Contempt Hearing Trans. at 63:23-66:12, Ex. P-23.)

23.    Other purchasers posted comments on e-Bay noting that Beal's products were "re-casts, and not originals" (July 3, 2003); "re-casts, and not original Warhammer" (July 3, 2003); "cheap copies not originals" (May 25, 2003); and "fakes" (March 19, 2003).  (Verified Complaint, ¶ 26, Ex. J; Contempt Hearing Trans. at 63:23-66:12, Ex. P-23.)

24.    Beal has also been the subject of Internet chat groups, where users repeatedly complain about and chronicle his sales of counterfeit GW Miniatures.  (Contempt Hearing Trans. at 66:24-73:6, Ex. P-22.)

25.    To confirm that Beal was selling counterfeit GW Miniatures, GW purchased certain miniatures from "mac-ace" through eBay.  Specifically, on March 25, 2003, GW placed orders through the UK-based buyer "M. Pritchard" for GW Miniatures sold under the following auction titles from Beal:  (1) "MK7 Space Marines w/Flamers WARHAMMER 40K," (2) "1st Blood Angel Captain oop WARHAMMER 40K," and (3) "Veteran Space Marine Captain Warhammer 40k."  On April 9, 2003, GW ordered, through M. Pritchard, GW Miniatures with the following auction titles from "mac-ace":  (1) "Eldar Skull Standard Bearer Warhammer 40k," and (2) "oops Warlocks Eldar Warhammer 40k."  (Verified Complaint, ¶ 28.)

26.    After ordering these products, GW (through "M. Pritchard") received a package of miniatures via United States Postal Service air mail, which was sent on April 14, 2003, and which bore the following return address:

Brian Beal
P.O. Box 15192
Kansas City, Missouri 64106[2]

(Verified Complaint, ¶ 29, Ex. L.)

27. The package contained miniatures that purported to be the following genuine GW Miniatures ordered by GW: (1) "Space Marine Captain," (2) "Space Marine With 'Flamer' Weapon," (3) "Tyco," (4) "Eldar Warlock With Sword," and (5) "Eldar Warlock With Spear" (collectively "the Beal Miniatures"). (Verified Complaint, ¶¶ 29-30, Exs. L-Q.)[3]

28. To determine whether the Beal Miniatures were genuine or counterfeit, GW employee Owen Branham analyzed them. Mr. Branham has been involved with the design and production of GW Miniatures for the past nine years, and has been responsible for overseeing the design and production of all GW Miniatures for the past three years. Mr. Branham determined that the Beal Miniatures were counterfeit based on the following factors:

• The Beal Miniatures are cast in soft metal, not pewter. Authentic GW Miniatures of equivalent age are cast in pewter.

• Authentic GW Miniatures are created only from GW's master models, and never from other production pieces. The Beal Miniatures are smaller than the authentic GW Miniatures. This size disparity indicates that the Beal Miniatures were cast (i.e., copied) from a production piece, and not from a GW master model.

• The Beal Miniatures display two mold lines. Mold lines are created when a model is first cast; there should be only one on a genuine GW Miniature. Any unauthorized miniature created using a production piece will replicate the original mold line and will add an additional line, which is present on the Beal Miniatures.

(Verified Complaint, ¶ 31; Branham Decl.)

29. Like the authentic GW Miniatures, the Beal Miniatures bore GW's federally

---

[2] Mr. Beal falsified to Customs that the package did not contain any merchandise, and that it was a "gift" toy with $0 value. (Verified Complaint, ¶ 29, Ex. L.)

[3] As noted above, SPACE MARINE and ELDAR are both registered trademarks of GW.

registered trademarks SPACE MARINE and ELDAR, and GW's common-law mark GW. Additionally, the figures were identified and sold on eBay auctions by using GW's federally registered WARHAMMER trademark and 40K common-law mark.  (Verified Complaint, ¶ 32.)

### F.  The Court's TRO and Preliminary Injunction Orders

30.     To stop Beal's unlawful activity, GW filed this lawsuit on January 6, 2004.  That same day, GW moved for an *ex parte* temporary restraining order, seizure order, and expedited discovery.

31.     The Court granted GW's motion on January 7, 2004, and temporarily restrained Beal from:

> [M]anufacturing, importing, exporting, offering for sale, promoting, advertising, selling, distributing, shipping, or transferring any counterfeit versions of Games Workshop's miniatures, and/or any non-Games Workshop gaming products bearing the marks SPACE MARINE, ELDAR, GAMES WORKSHOP, WARHAMMER, GW, 40K, or any of Games Workshop's other trademarks.

(Court's TRO at p. 3, ¶ A.1.)

32.     The Court also ordered a search of Beal's premises and required Beal to "file with the Court and serve on counsel for Plaintiff within in five (5) days after service of this Order, a report in writing and under oath, setting forth in detail the manner and form in which Defendant has complied with this Order."  (Court's TRO at p. 7, ¶ L.)

33.     On January 12, 2004, a search was conducted in accordance with the Court's Order.  During that search, GW found several hundred counterfeit GW miniatures.  (Bullough Decl. at ¶¶ 1-3, Contempt Hearing Trans. at 53:14-25.)

34.     During the search, GW advised Mr. Beal that the counterfeit items were covered by the TRO, which prohibited their sale, distribution, promotion, or offer for sale.  (Bullough Decl. at ¶¶ 1-3.)

35.     On January 16, 2004, Beal filed the required Compliance Report, where he stated under oath that he had "not made or sold any counterfeit versions of Games workshop;s [sic] products." (Compliance Report.)

36.     On January 15, 2004, Beal and GW stipulated to a Preliminary Injunction, both parties acting on advice of counsel. That injunction, which was entered by the Court on January 20, 2004, enjoined Beal from the same activities prohibited by the Court's TRO, the relevant language which is reproduced above. (Court's Preliminary Injunction Order at p. 1, ¶ A.1.)

**G.      Beal's False Compliance Report and Contempt of this Court's Orders**

37.     In violation of this Court's authority, and contrary to his own sworn declaration, Beal continued to sell counterfeit miniatures after the entry of the Temporary Restraining Order and Preliminary Injunction.

38.     Beal did so with full knowledge of this Court's orders, and with full knowledge of the numerous complaints levied against him on eBay, Internet chat groups, and otherwise. (Contempt Hearing Trans. at 63:13-16; 63:23-74:15, Exs. P-23, P-22.)

39.     In an effort to monitor Beal's compliance with the Court's Order, GW tracked Beal's various eBay auctions. (Pritchard Decl. at ¶¶ 1-2.) Through a random check, GW contacted the winner of one of Beal's auctions on February 5, 2004 and asked to purchase the miniatures from the winner, Fredrick Bennett. That auction was identified on eBay as auction no. 3169319461. (Bennett Decl. at ¶ 2; Pritchard Decl. at ¶ 2; Bennett Dep. at 17:1-18:9; 19:9-20:8) This was the first random check of Beal's auctions. (Pritchard Decl. at ¶¶ 1-2.)

40.     In the auction, Beal represented the auctioned items as genuine GW products by identifying them using GW's names and trademarks as follows: "Inquisitor's [sic] in TERMINATOR armor WARHAMMER 40k." (Rettew Decl. at ¶ 2.)

41.     Bennett agreed to GW's request and sent the miniatures to GW.  (Pritchard Decl. at ¶¶ 3-4; Bennett Decl. at ¶¶ 4-5; Webb Decl. at ¶¶ 2-3; Bennett Dep. at 17:1-17)

42.     Bennett indicated that when he purchased the miniatures from Beal, he believed that they were genuine GW products being resold over eBay.  (Bennett Decl. at ¶ 2; Bennett Dep. at 29:5-30:10.)

43.     After receiving the miniatures that Beal sold to Bennett, which bore GW's trademark "GW," GW analyzed them through two members of its U.S. mold-making team. (Webb Decl. at ¶¶ 2-3; Collison Decl. at ¶¶ 1-2; Martin Decl. at ¶¶ 1-2.)  GW determined that the miniatures were counterfeit based on the following:

•     The miniatures sold by Beal are cast in soft lead.  As a result, they are very soft and pliable.  Authentic GW Miniatures of equivalent age are cast in the harder metal pewter and are not as soft and pliable.

•     The miniatures sold by Beal are smaller than the authentic GW Miniatures.  Authentic GW Miniatures are created only from GW's master models, and never from other production pieces.  Based on their size, the Beal Miniatures were cast from a production piece, and not from a GW master model.

•     The miniatures sold by Beal show abnormal tearing and marking.  Such tearing and marking would not appear on an authentic GW miniature because GW uses black rubber molds that do not leave these types of abnormalities.  These tears and marks on the miniatures sold by Beal are likely the result of molds made of a low-quality silicone (low-quality silicone is widely available for purchase in hobby stores).

(Collison Decl. at ¶ 2; Martin Decl. at ¶ 2.)

44.     In view of Beal's violation of the Court's orders, and continued sale of counterfeit miniatures, GW filed a Motion for Contempt Sanctions on April 6, 2004.

45.     After filing its motion, GW conducted another random check and contacted the winner of two more Beal auctions.  GW asked to purchase the miniatures from the winner, Patrick Smalley.  Those auctions were identified on eBay as auction nos. 3173190877 and 3169158972.  (Contempt Hearing Trans. at 63:6-12; Smalley Dep. at 21:19-22:10.)

46.     In the auctions, Beal represented the auctioned items as genuine GW products by identifying them using GW's names and trademarks as follows: "Space Marine Heavy Gunner Lot Warhammer 40K" (for auction no. 3173190877) and "Space Marine Special Weapons Warhammer 40K" (for auction no. 3169158972). (Smalley Dep. at 20:19-21:24.)

47.     Smalley agreed to GW's request and sent the miniatures to GW. (Smalley Dep. at 17:10-20:2.)

48.     Smalley indicated that when he purchased the miniatures from Beal, he believed that they were genuine GW products being resold over eBay. (Smalley Dep. 22:3-22:18.)

49.     Smalley indicated that he would not have purchased the products had he known they were counterfeit. (Smalley Dep. at 22:19-23:12.)

50.     After receiving the miniatures that Beal sold to Smalley, which bore GW's trademark "GW," GW analyzed the miniatures and determined that they were counterfeit. (Contempt Hearing Trans. at 18:16-21:16.)

51.     On August 5, 2004 the Court held an evidentiary hearing on GW's Motion for Contempt Sanctions.

52.     During the evidentiary hearing, GW produced an expert who concluded that the miniatures Beal sold to Messrs. Bennett and Smalley were counterfeit, and who explained the bases for his findings in detail. (Contempt Hearing Trans. at 14:7-17:16; 18:16-24:23.)

53.     Beal testified at the hearing that even though he had received and was aware of the Court's Temporary Restraining Order and Preliminary Injunction, and even though he knew that numerous people had accused him of counterfeiting, he continued to buy miniatures from the same places, and that he had given to customers counterfeit miniatures (which other

customers had returned) as promotional "freebies."  (Contempt Hearing Trans. at 74:16-25; 83:3-84:2.)

54.    The Court granted GW's motion, holding that "[t]he evidence overwhelmingly indicates that defendant sold counterfeit items on e-Bay after entry of [the Court's] injunction." (Court's August 19, 2004 Order at 5.)

55.    The Court explained in its order that "in the pending motion for contempt sanctions and during the hearing on August 5, 2004, plaintiff set forth a great deal of uncontested evidence that certain miniatures sold by defendant after the entry of the stipulated preliminary injunction were counterfeit."  (Court's August 19, 2004 Order at 3.)

56.    Additionally, the Court noted "it is obvious to the Court that defendant has knowledge of many of the factors used to determine whether miniatures are counterfeit or not. Specifically, defendant testified he would not purchase miniatures if he could see double mold lines, noting that was a sign of a counterfeit item."  (Court's August 19, 2004 Order at 3.)

57.    As for relief, the Court ordered Beal to:  (1) keep information with regards to each item sold demonstrating what steps he took to ensure each was not counterfeit, and (2) report his sales to Games Workshop and the Court on a monthly basis.  For each future item sold by Beal and proven by Games Workshop to be counterfeit, the Court ordered that Beal be fined three times the sale price of the item plus Games Workshop's reasonable attorneys' fees incurred in the preparation of any motion for contempt of the Court's Order.  The Court also ordered Beal to pay Games Workshop $5,040 in attorneys' fees.  (Court's August 19, 2004 Order at 6-7.)

58.    The Court later modified its Order to require Beal to also detail the following in his reports:  (1) the item name of each item sold; (2) the e-Bay item number of each item sold;

(3) the date each item was sold; and (4) the price paid by the buyer for each item sold.  (Court's

October 8, 2004 Order.)

**III.**        **ARGUMENT**

       **A.**     **Summary Judgment is Favored Where, as**
                 **Here, the Material Facts are Undisputed**

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate in circumstances where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

Although the party opposing the motion is entitled to all favorable inferences, summary judgment is appropriate where the non-movant's evidence is merely colorable, conclusory, speculative, or not significantly probative. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986). Similarly, the non-movant cannot rely on the possibility of "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). A dispute over irrelevant or unnecessary facts will not preclude summary judgment. Anderson, 477 U.S. at 248.

Summary judgment is as appropriate in trademark cases as in any other case and should be granted or denied on the same principles. See, e.g., Duluth News-Tribune v. Mesabi Publ'g Co. 84 F.3d 1093, 1099 (8th Cir. 1996) ("When, as in this case, a trademark dispute centers on the proper interpretation to be given to the facts, rather than on the facts themselves, summary disposition is appropriate."); Woodsmith Publ'g Co. v. Meredith Corp., 904 F.2d 1244, 1247 (8th Cir. 1990) ("In unfair competition cases, the dispute between the parties usually 'centers on the

1

interpretation to be given to the facts -- not the facts themselves or the inferences that can be drawn from the facts.'") (internal citations omitted); Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 876 (2d Cir. 1986); WSM, Inc. v. Tennessee Sales Co., 709 F.2d 1084, 1086 (6th Cir. 1983).

B.     GW is Entitled to Judgment as a Matter of
        Law on its Trademark Counterfeiting Claim

The Lanham Act prohibits the use of "counterfeit" marks in connection with "the sale, offering for sale, or distribution of goods."  15 U.S.C. § 1116(d)(1)(A).  A counterfeit mark is defined as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark."  15 U.S.C. § 1127; 15 U.S.C. § 1116(d)(1)(B).  It is presumed that the counterfeiting of another's trademark establishes a likelihood of confusion—the test for trademark infringement.  Levi Strauss & Co. v. Sunrise Int'l Trading, Inc., 51 F.3d 982, 986 (11th Cir. 1995); Microsoft Corp. v. Compusource Distribs., Inc., 115 F. Supp. 2d 800, 806-07 (E.D. Mich. 2000) ("Where, as here, goods distributed by a defendant are virtually identical to the trademark owner's goods, likelihood of confusion is established."); Microsoft Corp. v. CMOS Techs., Inc., 872 F. Supp. 1329, 1335 (D.N.J. 1994) ("It would be difficult to imagine a clearer case of consumer confusion . . . [where] defendants . . . sold counterfeit products on which plaintiff's registered marks appear in their entirety.").

As shown above, Beal's counterfeit miniatures slavishly copy GW's SPACE MARINE and ELDAR trademarks.  Those marks are both federally registered for, *inter alia*, miniatures—the very same goods on which Beal places them.  (Verified Complaint, Exs. M-Q.)  By selling, offering for sale, and distributing recast miniatures bearing the identical federally registered SPACE MARINE and ELDAR trademarks, Beal has engaged in textbook trademark counterfeiting, and, as a result, has deceived customers into believing they are purchasing

2

genuine GW game pieces.  This type of fraudulent conduct directly violates the Lanham Act.

### C.  GW is Entitled to Judgment as a Matter of Law on its Trademark Infringement and Unfair Competition Claims

#### 1.  <u>The Test for Infringement and Unfair Competition</u>

Section 32(1) of the Lanham Act makes unlawful the use of a "reproduction, counterfeit, copy, or colorable imitation" of a registered mark in such a way as "is likely to cause confusion, or to cause mistake, or to deceive."  15 U.S.C. § 1114(1).  Similarly, Section 43(a) prohibits the use of a mark that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."  15 U.S.C. § 1125(a).  The test for unfair competition under Section 43(a) is the same as for trademark infringement under Section 32(1).  <u>Mutual of Omaha Ins. Co. v. Novak</u>, 836 F.2d 397, 398 n.1 (8th Cir. 1987).[4]

These laws protect trademark owners and the public against the wrong involved here— the unfair competition that results when an infringer seeks to capitalize on the recognition, marketing clout, and prestige of an established brand.  <u>Inwood Labs., Inc. v. Ives Labs. Inc.</u>, 456 U.S. 844, 855 n.14 (1982) ("the [trademark] infringer deprives the owner of the goodwill which he spent energy, time, and money to obtain"); <u>Hanover Star Milling Co. v. Metcalf</u>, 240 U.S. 403, 412 (1916) ("[t]he redress that is accorded in trade-mark cases is based upon the party's right to be protected in the goodwill of a trade or business").

---

[4]  GW's unfair competition claims under Missouri State and common laws are similarly guided by the same analysis.  <u>Anheuser Busch, Inc. v. Balducci Pubs.</u>, 814 F. Supp. 791, 798 (E.D. Mo. 1993) (holding that the elements for state and common-law unfair competition claims are "identical" to those for federal unfair competition under the Lanham Act ), <u>rev'd on other grounds</u>, 28 F.3d 769 (8th Cir. 1994).  As such, these claims will not be discussed separately.

Case 4:04-cv-00013-FJG   Document 65   Filed 10/15/04   Page 23 of 31

### 2. The Relevant Factors Establish a Likelihood of Confusion as a Matter of Law

The Eighth Circuit has established a multi-factor test for assessing trademark infringement. Those factors include: (1) strength of the owner's mark, (2) the similarity between the parties' marks, (3) the competitive proximity of the parties' products, (4) the alleged infringer's intent to confuse, (5) evidence of actual confusion, and (6) the degree of care reasonably expected of potential customers. Duluth News, 84 F.3d at 1096. Resolution of the likelihood of confusion "does not hinge on a single factor but requires a consideration of numerous factors to determine whether under all the circumstances there is a likelihood of confusion." Squirtco v. The Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir. 1980); Duluth News, 84 F.3d at 1096 ("[t]hese factors do not operate in a mathematically precise formula; rather, we use them at the summary judgment stage as a guide to determine whether a reasonable jury could find a likelihood of confusion.") Applying the undisputed facts to these factors compels a finding of infringement as a matter of law.

### a. GW's Trademarks and Miniature Designs are Strong Marks Entitled to a Brand Scope of Protection

There can be no question that GW's trademarks and miniature designs are strong and well known. Indeed, Defendant's very reason for selling miniatures offered in connection with GW's marks was to benefit from the commercial magnetism that those miniatures and marks have developed in the gaming community. See Sturgis Area Chamber of Commerce v. Sturgis Rally & Races, Inc., 99 F. Supp. 2d 1090, 1096 (D.S.D. 2000) ("The strength, or distinctiveness, of a trademark is its power to identify the source of a product or services.")

As a result of their inherent and acquired strength, and their ability to uniquely identify GW in the gaming field, GW's trademarks and miniature designs are entitled to the widest scope of protection. 2 McCarthy at §11:83. As detailed below, this wide scope of protection extends to

4

prohibit Beal's use of the same marks, for the same products, offered and sold to the same customers.  See Champions Golf Club v. Champions Golf Club, 78 F.3d 1111, 1117 (6th Cir. 1996) ("The stronger the mark, the more likely it is that the encroachment on it will produce confusion.") (cited with approval in 4 McCarthy at §24:49).

### b.        The Parties' Marks are Identical

Beal sold counterfeit miniatures bearing GW's registered and common-law trademarks.

### c.        The Parties' Products are Competitively Proximate

Both GW and Beal sell the same miniatures to the same consumers (gamers).  Indeed, the parties' products are so competitively proximate that Beal himself sells some legitimate GW miniatures with his counterfeit miniatures on eBay.  See Sturgis, 99 F. Supp. 2d at 1098 (noting that "[t]he greater the similarity between products and services, the greater the likelihood of confusion" (quoting Elvis Presley Enters., Inc. v. Capece, 141 F.3d 188, 203 (5th Cir. 1988)).

### d.        Beal Intended to Profit From GW's Goodwill

Beal has used GW's marks for only one purpose:  to deceive consumers into believing that they are purchasing genuine GW Miniatures, when they are not.  This is significant, for "[p]roof of an intent to confuse the public is not necessary to a finding of likelihood of confusion, 'but' if a mark was adopted with the intent to confuse the public, that alone may be sufficient to justify an inference  of likelihood of confusion."  SquirtCo., 628 F.2d at 1091; Mutual of Omaha, 836 F.2d at 399.

### e.        Actual Confusion Has Arisen

"[I]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source."  Lois Sportswear, 799 F.2d at 875; see also ConAgra Inc. v. George A. Hormel & Co., 990 F.2d  368, 371 (8th Cir. 1993) (plaintiff "need not prove intent

5

or actual confusion" to prevail); <u>Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.</u>, 109 F.3d 275, 284 (6th Cir. 1997) ("Due to the difficulty of securing evidence of actual confusion, a lack of such evidence is rarely significant . . . ."); 3 <u>McCarthy</u> at §23:12. But manifestations of actual confusion serve as strong evidence of the likelihood of confusion. <u>Mutual of Omaha</u>, 836 F.2d at 400. Further, where, as here, the goods at issue are inexpensive, evidence of actual confusion is more difficult to obtain. 3 <u>McCarthy</u> at §23:14 ("when the goods are inexpensive, it is difficult to obtain actual confusion evidence"); <u>Beer Nuts, Inc. v. Clover Club Foods Co.</u>, 805 F.2d 920, 928 (10th Cir. 1986) ("Purchasers are unlikely to bother to inform the trademark owner when they are confused about an inexpensive product").

Nevertheless, actual confusion has arisen here. Victims of Beal's counterfeit sales—Patrick Smalley and Frederick Bennett—did not realize that the miniatures they purchased were counterfeit until they were contacted by GW. And both testified that they would not have bought the miniatures had they known the products were fake.

### f.    The Parties' Products are Inexpensive

"[T]he price level of the goods or services is an important factor in determining the amount of care the reasonably prudent buyer will use." 3 <u>McCarthy</u> at § 23:95. "[A] finding that the product is inexpensive and not the kind a consumer would devote inordinate time and attention in making a purchasing decision weighs in favor of a conclusion that a likelihood of confusion exists." <u>Heidi Ott A.G. v. Target Corp.</u>, 153 F. Supp. 2d 1055, 1066 (D. Minn. 2001); <u>see also</u> <u>ConAgra, Inc. v. George A. Hormel & Co.</u>, 784 F. Supp. 700, 736 (D. Neb. 1992) (holding that where the goods at issue are inexpensive, "[t]his would tend to suggest consumers would be less careful, and therefore more likely to be confused, by any similarity in the marks"), <u>aff'd</u>, 990 F.2d 368 (8th Cir. 1993).

Given the low price of the products at issue in this case, consumers are more apt to be confused.  Additionally, even discerning purchasers will fall prey to Beal's counterfeiting because the indicia that distinguish genuine from fake miniatures (size, color, mold lines) cannot readily be discerned through Beal's eBay auction pages.  Thus, by passing off counterfeits as genuine products, Beal has betrayed the public's trust.

**D.     GW is Entitled to Judgment as a Matter of Law on its Copyright Claims**

**1.     The Standard for Proving Copyright Infringement**

To prove copyright infringement, Games Workshop must show (1) that it owns valid copyrights in the GW Miniatures, and (2) that Beal "copied" the GW Miniatures.  <u>Taylor Corp. v. Four Seasons Greetings</u>, 315 F.3d 1039, 1043 (8th Cir. 2003).  As shown below, GW has firmly established ownership of the copyright in the GW Miniatures, and that Beal has "copied" the GW Miniatures.

**2.     GW Owns Copyrights in the GW Miniatures**

As noted above, GW is the original creator of the following GW Miniatures:  "Space Marine Captain," "Space Marine with 'Flamer' Weapon," "Tyco," "Elder Warlock with Sword," and the "Elder Warlock with Spear."  As the original creator of these works, GW owns the copyrights in them.  <u>Community for Creative Non-Violence v. Reid</u>, 490 U.S. 730, 737 (1989) (noting that the owner of copyright is generally "the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection").[5]

---

[5]  While a plaintiff typically must produce United States copyright registrations to bring an infringement action, or to be awarded injunctive and monetary relief, that requirement does not apply to non-U.S. works The GW Miniatures should not be considered "United States works" under 17 U.S.C. § 411, as defined in 17 U.S.C. § 101, as each were created in a Berne Convention country, namely, the United Kingdom.  <u>See</u> <u>Edmark Indus. v. South Asia Int'l Ltd.</u>,

### 3. Beal Has Infringed GW's Copyrights as a Matter of Law

"Copying" is the shorthand reference to the act of infringing any of the copyright owner's six exclusive rights set forth at 17 U.S.C. § 106. S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081, 1085 n.3 (9th Cir. 1989). In other words, a copyright is infringed when any of the exclusive rights of the copyright owner as provided in Section 106(1)-(6) of the Copyright Act are violated. 17 U.S.C. § 501(a). Under Section 106, a copyright owner has the exclusive right to distribute copies of the copyrighted work. 17 U.S.C. § 106(3). When a defendant distributes counterfeit copies of a copyrighted work, the defendant has violated the copyright owner's exclusive rights under 17 U.S.C. § 106(3) and is liable for copyright infringement. See, e.g., Microsoft Corp. v. Computer Service & Repair, Inc., 312 F. Supp. 2d 779, 784 (E.D.N.C. 2004) ("Having distributed a counterfeit and unauthorized copy of software in which plaintiff holds a valid copyright, defendant has infringed plaintiff's exclusive rights under the Copyright Act."); Walt Disney Co. v. Video 47, Inc., 972 F. Supp. 595, 601 (S.D. Fla. 1996) (finding defendants liable for copyright infringement because defendants violated plaintiffs' rights under 17 U.S.C. § 106(3) by renting and distributing counterfeit videocassette tapes in which plaintiffs owned valid copyrights).

Here, it is indisputable that Beal has distributed counterfeit copies of the GW Miniatures on eBay. As such, he has infringed GW's copyrights as a matter of law.

### E. GW is Entitled to an Award of its Attorneys' Fees as a Matter of Law[6]

_____

89 F. Supp. 2d 840, 844 (E.D. Tex. 2000) (noting that works created in Berne Convention countries are exempt from U.S. registration requirements).

[6] Concerning monetary relief, GW's motion relates only to its request for attorneys' fees under the Lanham Act. GW reserves all other available remedies in this case for later disposition.

Section 35(b) of the Lanham Act provides for special monetary remedies for counterfeiting cases as follows:

> In assessing damages under subsection [35](a), the Court shall, unless the Court finds extenuating circumstances, enter judgment for three times such profits or damages, which ever is greater, together with a reasonable attorney's fee, in the case of any violation of Section 32(1)(a) of this Act.

Lanham Act § 35(b), 15 U.S.C. § 1117(b).

Congress has emphasized that it will be a "rare case" and a "highly unusual" instance in which a Defendant who has trafficked in goods that he or she knows to be counterfeit can show some "extenuating circumstances" justifying that enhanced damages not be assessed. Senate-House Joint Explanatory Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. H12076, at 12083 (Oct. 10, 1994); 5 McCarthy at § 30:94. Moreover, willful blindness is no defense to a charge of "knowledge" and enhanced monetary remedies. 5 McCarthy at § 30:94. It is sufficient that a retailer "failed to inquire further because he was afraid of what the inquiry would yield. Willful blindness is knowledge enough." Louis Vuitton S.A. v. Lee, 875 F.2d 584, 587 (7th Cir. 1989) (holding that merchants who resold poorly crafted counterfeit luggage obtained from a peddler at very low prices "knowingly" engaged in the sale of counterfeit goods); Hard Rock Café Licensing Corp. v. Concession Servs., Inc., 955 F.2d 1143 (7th Cir. 1992) (holding "willful blindness is equivalent to actual knowledge for purposes of the Lanham Act . . . To be willfully blind, a person must suspect wrongdoing and deliberately fail to investigate.")

Moreover, as explained by Professor McCarthy, "a retailer who buys inferior quality merchandise marked with a famous brand name at an unusually low price from an itinerant peddler and resells it cannot defend on the ground that he or she did not 'know' that something was amiss. This is 'willful blindness.'" 5 McCarthy at § 30:94.

9

In this case, Beal has been fully aware that numerous people have complained about his counterfeit activities. Ignoring these complaints, and orders from this Court, Beal has recklessly and blindly continued to buy the same products, from the same people, at the same low prices. Indeed, it is for this very reason that the Court found Beal in contempt of its temporary restraining order and preliminary injunction.[7]

**IV.        CONCLUSION**

As detailed above, no genuine issue of material fact exists on GW's claims for counterfeiting, trademark infringement, unfair competition, and copyright claims, and on Games Workshop's claim for attorneys' fees. Thus, GW is entitled to judgment as a matter of law on those claims.

---

[7]  Beal should also be ordered to pay GW's attorneys' fees under the non-counterfeiting damages section of the Lanham Act. Section 35 of the Lanham Act provides that "[t]he Court in exceptional cases may award reasonable attorneys' fees to the prevailing party." 15 U.S.C. § 1117(a). In the Eighth Circuit, "[w]hen a defendant intentionally and willfully infringes the trademark of another such an exceptional case exists." Hallmark Cards, Inc. v. Hallmark Dodge, Inc., 634 F. Supp. 990, 1001 (W.D. Mo. 1986) (citing Metric & Multistandard Components Corp. v. Metric's, Inc., 635 F.2d 710, 716 (8th Cir. 1980)). Further, as explained by Professor McCarthy: "where there is proof of intentional infringement . . . it is an abuse of discretion not to award attorney fees." 5 McCarthy at § 30:100 (and cases cited therein); Tri-Star Pictures, Inc. v. Unger, 14 F. Supp. 2d 339, 364 (S.D.N.Y. 1998) (holding that "it is an abuse of discretion for a district court to fail to consider an award of attorney's fees in cases involving willful infringement"). For the reasons detailed above, this case is "exceptional."

10

Respectfully submitted,


Date:   October 15, 2004                  By:   /s/Jason E. Gorden
                                          Michael Elbein (MBE 27708)
                                          Jason E. Gorden (MBE 53592)
                                          HOVEY WILLIAMS LLP
                                          2405 Grand Blvd., Suite 400
                                          Kansas City Missouri 64108-2519
                                          Telephone:  (816) 474-9050
                                          Facsimile:  (816) 474-9057


Mark Sommers
Douglas A. Rettew
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, L.L.P.
1300 I Street, N.W.
Washington, DC  20005-3315
Telephone:  (202) 408-4000
Facsimile:  (202) 408-4400

11